# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

REALTIME DATA LLC d/b/a IXO,

        Plaintiff,

    v.

ARRAY NETWORKS INC et al.,

        Defendants.

C.A. No. 17-800-CFC

## PLAINTIFF REALTIME DATA LLC'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' RENEWED MOTION TO DISMISS (D.I. 78)

July 13, 2021

OF COUNSEL:

Marc A. Fenster
Brian D. Ledahl
Reza Mirzaie
Paul A. Kroeger
C. Jay Chung
RUSS AUGUST & KABAT
12424 Wilshire Boulevard, 12th Floor
Los Angeles, CA 90025
(310) 826-7474
mfenster@raklaw.com
bledahl@raklaw.com
rmirzaie@raklaw.com
pkroeger@raklaw.com
jchung@raklaw.com

BAYARD, P.A.

Stephen B. Brauerman (No. 4952)
Ronald P. Golden III (No. 6254)
600 N. King Street, Suite 400
Wilmington, DE 19801
(302) 655-5000
sbrauerman@bayardlaw.com
rgolden@bayardlaw.com

*Attorneys for Plaintiff Realtime Data LLC*

# **TABLE OF CONTENTS**

**Page(s)**

I.   INTRODUCTION ..................................................................................1

II.  FACTUAL BACKGROUND .................................................................1

    A.  The Asserted Patents .................................................................1

    B.  Prior Decisions Regarding Realtime's Patents ..........................2

III.  DEFENDANTS HAVE NOT MET THEIR BURDEN TO CLEARLY AND CONVINCINGLY ESTABLISH THAT THE CLAIMS ARE INVALID UNDER § 101 ......................................................................................4

    A.  Defendants Cannot Show that the Claims Are Directed to an Abstract Idea Under *Alice* Step 1. ..........................................4

        **1.** Recent Federal Circuit precedent confirms that the claims are not abstract. ..................................................................4

        **2.** Defendants' oversimplification of the '728, '203, and '825 patents improperly ignores the claimed advances and must be rejected. ...........................................................11

        **3.** Defendants' arguments regarding the '908, '530, and '458 patents also improperly ignore the claimed advances and must be rejected. ...........................................................17

        **4.** Defendants' arguments regarding the '751 patent also improperly ignore the patent's claimed advance and must be rejected. ...........................................................21

        **5.** The cases cited by Defendants are inapposite. ................23

        **6.** Realtime's allegations that the claims cannot be carried out with pen and paper are relevant to the Court's prior decision. ...........................................................24

    B.  Defendants Also Cannot Show that the Claims Lack Inventive Concept Under *Alice* Step 2. ..................................................25

        **1.** The intrinsic record confirms that the claimed inventions involve unconventional technological solutions. .....................26

        **2.** Defendants' conclusory arguments regarding the '728, '203, and '825 patents are unsupported and contrary to law. ...........29

**3.** Defendants' conclusory arguments regarding the '908, '530, and '458 patents are unsupported and contrary to law. ............31

**4.** Defendants' conclusory argument regarding the '751 patent is unsupported and contrary to law. ...........................................33

**5.** The analysis under *Alice* step 2 involves questions of fact improper for resolution on a motion to dismiss. .......................34

**6.** Defendants have not clearly and convincingly shown that all 211 claims are ineligible. ...........................................................35

C.  As Set Forth in Realtime's Amended Complaints, Proper Construction of the Claims Confirms that the Claims Are Patent Eligible Under § 101. ..........................................................................36

IV.  CONCLUSION ................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
  882 F.3d 1121 (Fed. Cir. 2018) ..............................................................35

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
  827 F.3d 1341 (Fed. Cir. 2016). ..............................................................30

*CardioNet, LLC v. InfoBionic, Inc.*,
  955 F.3d 1358 (Fed. Cir. 2020) ..............................................................19

*Customedia Techs., LLC v. Dish Network Corp.*,
  951 F.3d 1359 (Fed. Cir. 2020) ..............................................................23

*DDR Holdings, LLC v. Hotels.com, L.P.*,
  773 F.3d 1245 (Fed. Cir. 2014) ..............................................................12

*Enfish, LLC v. Microsoft Corp.*,
  822 F.3d 1327 (Fed. Cir. 2016) ..............................................................12

*Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd*,
  955 F.3d 1317 (Fed. Cir. 2020). ..............................................................24

*Intell. Ventures I LLC v. Symantec Corp.*,
  838 F.3d 1307 (Fed. Cir. 2016) ..............................................................12

*JSDQ Mesh Techs. LLC v. Fluidmesh Networks, LLC*,
  No. 16-CV-212-GMS, 2016 WL 4639140 (D. Del. Sept. 6, 2016) ....................32

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
  942 F.3d 1143 (Fed. Cir. 2019), ..............................................................3

*MAZ Encryption Techs. LLC v. Blackberry Corp.*,
  No. CV 13-304-LPS, 2016 WL 5661981 (D. Del. Sept. 29, 2016). ...................32

*MySpace, Inc. v. Graphon Corp.*,
  672 F.3d 1250 (Fed. Cir. 2012) ..............................................................24

*Packet Intelligence LLC v. NetScout Sys., Inc.*,
   965 F.3d 1299 (Fed. Cir. 2020) ...............................................................3

*Realtime Data LLC v. Reduxio Sys., Inc.*,
   831 F. App'x 492 (Fed. Cir. 2020) .........................................................3

*SAP Am., Inc. v. InvestPic, LLC*,
   898 F.3d 1161 (Fed. Cir. 2018) .............................................................23

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
   930 F.3d 1295 (Fed. Cir. 2019) ...............................................................3

*Synopsys, Inc. v. Mentor Graphics Corp.*,
   839 F.3d 1138 (Fed. Cir. 2016) .............................................................24

*TecSec, Inc. v. Adobe Inc.*,
   978 F.3d 1278 (Fed. Cir. 2020) ...............................................................3

*Uniloc USA, Inc. v. LG Elecs. USA, Inc.*,
   957 F.3d 1303 (Fed. Cir. 2020), ..............................................................3

*Visual Memory LLC v. NVIDIA Corp.*,
   867 F.3d 1253 (Fed. Cir. 2017) .............................................................15

*WhitServe LLC v. Dropbox, Inc.*,
   No. CV 18-665-CFC, 2019 WL 3342949 (D. Del. July 25, 2019) .....................24

## I.     INTRODUCTION

Realtime's amended complaints set forth numerous detailed factual allegations that demonstrate that the claims at issue here are not abstract, but rather are limited to particularized technological solutions that improve computer capabilities—*e.g.*, digital data compression systems to increase the capacity of a computer system to store or transfer data faster and more efficiently. Further, the claims describe specific ways (*e.g.*, using state machine, data accelerator, performing analysis that is not based solely on a descriptor, *etc.*) to make this happen, and do not merely recite results. The Court must accept these allegations as true and draw inferences in favor of Realtime. Defendants' conclusory and unsupported attorney argument that the claims are drawn to ineligible subject matter does not meet their heightened burden to show that the *only* plausible reading of the patents must be that there is clear and convincing evidence of ineligibility. Their motion should be denied.

## II.    FACTUAL BACKGROUND

### A.     The Asserted Patents

Realtime has asserted seven patents from three distinct patent families in these consolidated cases. The '728, '203, and '825 patents are in one family. The '908, '530, and '458 patents are in another, unrelated family. And the '751 patent is in a third family, unrelated family.

1

At a high level, these patent families have some commonality in that they teach improved, particularized digital data compression systems and methods to address problems specific to digital data. Indeed, the patents themselves expressly state that they deal specifically with limitations and problems arising in the realm of compressing "[d]iffuse digital data," which is "a representation of data" that is "not easily recognizable to humans in its native form." ('728 patent at 1:34–54.) But while the patents are all generally directed to specific methods and systems for digital data compression, each patent represents a distinct invention, and each patent family is directed to different systems and methods of digital data compression, as set forth in detail in Realtime's amended complaints. (D.I. 43–54.)

## B.    Prior Decisions Regarding Realtime's Patents

As this Court is aware, multiple judges across two different districts have upheld the patentability of Realtime's patents under 35 U.S.C § 101. Those orders are described in detail in Realtime's prior § 101 briefing, as well as the amended complaints filed in this action, which Realtime incorporates herein. (*See, e.g.*, D.I. 53 ¶¶ 12–15; C.A. No. 19-350-CFC ("*Kaminario*"), D.I. 33 at 2–3.)

 This Court, however, has previously concluded otherwise. In a prior ruling on a motion to dismiss, this Court found that the '728, '908, '530, and '751 patents claimed ineligible subject matter. (C.A. No. 17-1676, D.I. 46.) Realtime appealed, and the Federal Circuit vacated the Court's judgments and remanded for further

proceedings consistent with its opinion in *Realtime Data LLC v. Reduxio Sys., Inc.*, 831 F. App'x 492 (Fed. Cir. 2020). In that opinion, the Federal Circuit "caution[ed] the district court away from sweeping generalizations and encourage[d] the court to carefully consider the 'directed to' question once more." *Id.*

Judge Taranto also issued a concurring opinion wherein he reiterated that "§ 101 inquiries demand close attention to the specific content of the patent claims at issue, and that courts must avoid 'overgeneralizing' and 'oversimplifying' the claims." *Id.* at 499. He further observed that Realtime's claims, "on their face and understood in light of the specifications, purport to ***solve engineering problems in the transfer of data***." *Id.* at 500.[1] He concluded his opinion by directing the Court to several post-July 2019 precedents which "provide clarifying guidance concerning the inquiries pertinent to the analysis" in this case, including *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278 (Fed. Cir. 2020), *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303 (Fed. Cir. 2020), *Packet Intelligence LLC v. NetScout Sys., Inc.*, 965 F.3d 1299 (Fed. Cir. 2020), *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143 (Fed. Cir. 2019), and *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295 (Fed. Cir. 2019). *Id.* at 501. These decisions, which confirm the patentability of Realtime's patents, are discussed below.

Following remand, this Court issued an order finding all claims of the seven

---

[1] All emphases herein added unless otherwise noted.

asserted patents invalid under § 101. (D.I. 41.) The Court granted Realtime leave to amend, and Realtime filed the operative amended complaints on May 18, 2021. (D.I. 43–54.) Those complaints contain detailed factual allegations regarding each asserted patent, and proposed constructions for certain claim terms, that, accepted as true, establish that the patents are directed to improvements in existing technology and do not merely claim abstract ideas. (*See, e.g.*, D.I. 53 ¶¶ 10–15, 18–32, 49–61, 79–91, 109–125.) Realtime refers to and incorporates those allegations herein.

## III.  DEFENDANTS HAVE NOT MET THEIR BURDEN TO CLEARLY AND CONVINCINGLY ESTABLISH THAT THE CLAIMS ARE INVALID UNDER § 101[2]

### A.  Defendants Cannot Show that the Claims Are Directed to an Abstract Idea Under *Alice* Step 1.

#### 1.  Recent Federal Circuit precedent confirms that the claims are not abstract.

As set forth in Realtime's prior briefing, the Federal Circuit has repeatedly upheld the patentability of claims, such as those at issue here, that claim specific improvements in computer functionality. (*See, e.g.*, *Kaminario*, D.I. 33 at 6–11 (discussing *Finjan*, *Enfish*, *DDR*, *Visual Memory*, and *Core Wireless*).) The Federal Circuit has since issued several other opinions upholding the patentability of claims that are directly comparable to this case. Indeed, Judge Taranto specifically directed

---

[2] The § 101 issues presented by Defendants' motion have been briefed multiple times. To avoid repetition, Realtime refers to and incorporates the legal standard for Rule 12(b)(6) motions, and the basic *Alice* framework for evaluating patentability under § 101 set forth in its prior briefing. (*See, e.g.*, *Kaminario*, D.I. 33 at 3–5.)

the Court to these cases, noting that they "provide clarifying guidance concerning the inquiries pertinent to the analysis" in this case. *Realtime*, 831 F. App'x at 501.

For example, in *SRI*, the Federal Circuit held claims drawn to a method of computer network monitoring to be patent-eligible. At *Alice* step one, the Federal Circuit held that the claims were not directed to an abstract idea because they were "necessarily rooted in computer technology in order to solve a specific problem in the realm of computer networks." 930 F.3d at 1303. The Federal Circuit recognized that the claims did not merely use a computer as a tool (i.e., "automating a conventional idea on a computer"), but, instead, recited a "specific technique for improving computer network security." *Id.* at 1303–04. The Federal Circuit further relied on statements in the specification explaining that the claimed invention was "directed to solving … weaknesses in conventional networks," which "bolster[ed] [its] conclusion that the claims are directed to a technological solution to a technological problem." *Id.*

In *Koninklijke*, the Federal Circuit reversed the district court's grant of judgment on the pleadings and held that claims directed to an improved check data generating device were patent eligible. At *Alice* step one, the district court found that the claims were directed to the abstract idea of "reordering data and generating additional data," analogizing the claims to data manipulation claims found ineligible in cases like *RecogniCorp*, on which Defendants here heavily rely. 942 F.3d at 1148.

The Federal Circuit, however, rejected this oversimplification, and held that they were "directed to a non-abstract improvement in an existing technological process (i.e., error checking in data transmissions)." *Id.* at 1150. The Federal Circuit further explained that by "requiring that the permutation applied to original data be modified 'in time,'" the claims recite a "specific implementation of varying the way check data is generated that improves the ability of prior art error detection systems to detect systematic errors." *Id.*

In *Uniloc*, the Federal Circuit reversed yet another order of dismissal under § 101, this time concerning claims directed to an improvement in wireless technology for exchanging data between a primary station and a secondary station. 957 F.3d at 1305. The Federal Circuit held that the claims were directed to a "patent-eligible improvement to computer functionality, namely the reduction of latency" experienced in conventional systems. *Id.* at 1306–07. In so holding, the Federal Circuit rejected the defendant's argument that the claims merely used "result-based functional language" and "generic" components, and that they were analogous to "data manipulation" claims previously deemed ineligible. *Id.* at 1308. The Federal Circuit explained that the claims were directed to a "specific asserted improvement in the functionality of the communication system itself," and that the "invention's compatibility with conventional communication systems does not render it abstract." *Id.* at 1308–09. "Nor does the fact that the improvement is not defined by reference

6

to 'physical' components." *Id.* As noted by the Federal Circuit, to hold otherwise would create a "categorical ban on software patents," which is contrary to longstanding precedent holding that "software can make patent-eligible improvements to computer technology." *Id.* at 1309.

In *Packet Intelligence*, the Federal Circuit upheld the eligibility of patents that disclosed a method for monitoring data packets exchanged over a computer network. 965 F.3d at 1303–04. The district court rejected the defendants' oversimplification of the claims as being directed to "collection, comparison, and classification of information," and held that they were instead directed to "specific technological solutions." *Id.* at 1308. The Federal Circuit affirmed, holding that, as in *SRI*, the claim "purports to meet a challenge unique to computer networks," as confirmed by statements in the specifications identifying limitations in conventional network monitoring systems which the claimed inventions sought to address. *Id.* at 1309–10.

And finally, in *TecSec*, the Federal Circuit upheld the eligibility of patents directed to a system for restricting access to computer data. As it did in *Realtime*, the Federal Circuit "reiterated the Supreme Court's caution against 'overgeneralizing claims' in the § 101 analysis, explaining that characterizing the claims at 'a high level of abstraction' that is 'untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule.'" 978 F.3d at 1293. The Federal Circuit explained that it has upheld the eligibility of patents

directed to improvements in computer technology "in a number of cases" where it has made two significant inquiries: (1) "whether the focus of the claimed advance is on a solution to 'a problem specifically arising in the realm of computer networks' or computers," and (2) "whether the claim is properly characterized as identifying a 'specific' improvement in computer capabilities or network functionality, rather than only claiming a desirable result or function." *Id.* at 1293. The Federal Circuit emphasized that "accurate characterization of what the claims require and of what the patent asserts to be the claimed advance" is "**crucial**" to the step 1 "directed to" analysis. *Id.* at 1294.

Under this framework, the Federal Circuit rejected the defendant's oversimplification that the claims as being directed to the abstract idea of managing access to objects using multiple levels of encryption. *Id.* at 1294. The Federal Circuit found that this characterization was "materially inaccurate," and that to arrive at it, defendant "had to disregard elements of the claims at issue that the specification makes clear are important parts of the claimed advance in the combination of elements," such as "accessing an 'object-oriented key manager,'" and using a "label" as well as "encryption for the access management." *Id.* at 1294–95. The Federal Circuit further relied on statements in the specification expressly identifying deficiencies in the current art, demonstrating that "the claims at issue are directed at solving a problem 'specific to computer data networks.'" *Id.* at 1295. In light of the

claim language and specification, the Federal Circuit concluded that the claims were directed to "improving a data network's basic functioning" by "enabling secure and efficient data transmission," and that defendant's attempt to ignore the focus of the claimed advance could not render them abstract. *Id.* at 1296.

As in *SRI*, *Koninklijke*, *Uniloc*, *Packet Intelligence*, and *TecSec*, the claimed inventions here are "necessarily rooted in computer technology" in order to solve specific problems in the realm of digital data compression, which problems are expressly identified and addressed in the patent specifications, and also set forth in detail in Realtime's amended complaints. For example, the '728, '203, and '825 patents describe various problems in the conventional art, including the "content sensitive behavior" of conventional systems and the "extremely large number of application programs" and data types or content. ('825 patent at 2:26–3:15.) The claimed inventions solved these problems by providing systems utilizing two digital-data compression techniques (*e.g.*, content dependent and content independent) to compress/decompress data blocks based on analysis of the specific content of data. And the patents addressed limitations in conventional systems which relied solely on a descriptor by requiring a direct examination of the digital-data payload rather than examining just the descriptor. (*See, e.g.*, '825 patent, claim 1.)

The '908, '530, and '458 patents are directed to solving problems in conventional digital data compression and data storage systems, including, for

example, that "high performance disk interface standards … offer only the promise of higher data transfer rates through intermediate data buffering in random access memory," and do not address the "fundamental problem" with physical media limitations. ('908 patent at 2:34–42.) The claimed inventions solved these problems by utilizing a plurality of different encoders, and optionally a compression descriptor, for accelerated storage and retrieval of data blocks. (*See, e.g.,* '458 patent, claim 1.).

The '751 patent is directed to systems and methods for providing accelerated transmission of digital data over a communication channel using data compression and decompression to effectively increase the bandwidth of the communication channel and/or reduce the latency of data transmission associated with conventional systems. The disclosed inventions solved these problems by utilizing a state machine to compress data blocks based on an analysis of the specific content of the data being encoded. (*See, e.g.,* '751 patent, claim 1.)

These inventions are precisely the types of claims that the Federal Circuit has repeatedly held are not abstract. The patent specifications make clear that the claimed advances are focused on solutions to problems specifically arising in the realm of computer technology (more specifically, digital data compression), and the claims identify "specific techniques" to address these problems and improve computer functionality. *TecSec*, 978 F.3d at 1294; *SRI*, 930 F.3d at 1303.

10

**2.      Defendants' oversimplification of the '728, '203, and '825 patents improperly ignores the claimed advances and must be rejected.**

In arguing that the '728, '203, and '825 are directed to an abstract idea, Defendants cannot even settle on what exactly that abstract idea purportedly is. In one instance, Defendants claim that all three patents are directed to the abstract idea of "transforming data." (MOT. at 9.) In other instances, Defendants claim that the '728 patent is directed to "systems and methods for compressing data," "abstract information processing," and "choosing an undisclosed compression method based on data type," and that the '203 patent is directed to "the abstract idea of data manipulation via analysis, compression, decompression, and storage," "mere data manipulation," and "selecting a decompression technique based on the method of compression." (*Id.* at 15–19.) Defendants' ever-changing characterizations of the patents all have one thing in common, though—they improperly ignore the claim language and the what the *patents assert* to be the claimed advances over the prior art. *See TecSec*, 978 F.3d at 1294–95.

Indeed, Defendants' extreme over-simplifications of the patents are contradicted by their own arguments. Elsewhere in their brief, they concede that the patents are directed to more than merely "manipulating data," and "describe a system for compressing data that looks beyond data descriptors (e.g., .doc or .txt) to the attributes of the data itself." (MOT.. at 9; *see also id.* at 14–15 (asserting that the '728 and '825 patents are "directed to systems and methods of compressing data based on

11

the type of data").) Even under this watered-down characterization of the patents'
claimed advances, it is clear that they are not abstract. *TecSec*, 978 F.3d at 1295
(claims directed to improved data transmission through "labeling together with
encryption" are not abstract); *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d
1245, 1259 (Fed. Cir. 2014) (an "improved, particularized method of digital data
compression" not abstract); *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307,
1315 (Fed. Cir. 2016) (same); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339
(Fed. Cir. 2016) (claims directed to "improv[ing] the way a computer stores and
retrieves data in memory" not abstract). Defendants provide no evidence or authority
to support the conclusion that such specific improvements in digital data
compression aimed at solving known problems in the current art (*e.g.*, data
dependency) are abstract. Instead, Defendants rely on a variety of disjointed and
contradictory arguments that have no basis in fact or law.

For example, for the '825 patent, Defendants asserted that the claims "consist
entirely of general, abstract steps." (MOT. at 10.) This is the wrong analysis.
Supreme Court and Federal Circuit precedent make clear that under *Alice* step 1, the
Court must look at the claims *as a whole*—not analyze individual steps to determine
whether each is abstract—and must look to the specifications to inform its
understanding of what the claims are "directed to." *See, e.g.*, *TecSec*, 978 F.3d at
1292 ("We have approached the Step 1 'directed to' inquiry by asking what the

*patent asserts* to be the focus of the claimed advance over the prior art. In conducting that inquiry, we must focus on the language of the Asserted Claims themselves, considered in light of the specification." (cleaned up)); *Realtime*, 831 F. App'x at 496 (finding the Court's "failure to evaluate the claims as a whole" was reversible error). And here, the patents assert non-abstract improvements to digital data compression. For example, the '825 patent claims "are not directed solely to compressing data based on the content of the data [(which is not abstract in any event)], but also to selecting an encoder to encode data based on more than just a file descriptor, but instead the content of the data." (D.I. 46 ¶ 77; *see also* '825 patent at 3:49–67.)

Defendants' assertion that "[n]othing in the patent … goes beyond conducting data analysis and performing mathematical operations" (MOT. at 10) also fails. The only way to reach this conclusion would be to simply "disregard elements of the claims at issue that the specification makes clear are important parts of the claimed advance in the combination of elements" (*e.g.*, '825 patent, claim 1). *TecSec*, 978 F.3d at 1294–95. Characterizing the claims at such a "'high level of abstraction' that is 'untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule.'" *Id.* at 1293. Indeed, essentially all software patents could be characterized as simply "conducting data analysis and performing mathematical operations" when stripping away critical claim limitations, as Defendants attempt to

do here. The Federal Circuit, however, has expressly rejected such characterizations which would in effect create a "categorical ban on software patents." *Uniloc*, 957 F.3d at 1309 (rejecting the characterization of the claims as being directed to mere "data manipulation"); *Koninklijke*, 942 F.3d at 1148 (same); *SRI*, 930 F.3d at 1304 (rejecting argument that the claims were simply directed to "generic steps required to collect and analyze data"); *Packet Intelligence*, 965 F.3d at 1308 (rejecting defendants' oversimplification of the claims as being directed to "collection, comparison, and classification of information").

Nor does the fact that the patents use "'well known' technology, such as encoders," or that they "don't 'even require physical components'" (MOT. at 11–13) render them abstract. The Federal Circuit has repeatedly rejected such arguments. *See, e.g.*, *Packet Intelligence*, 965 F.3d at 1308–09 (rejecting arguments that the patent's use of "generic Bluetooth components," and its purported failure to define the alleged improvement "by reference to 'physical' components," supported a finding that they were directed to the abstract idea of "data manipulation"); *Uniloc*, 957 F.3d at 1309 ("The claimed invention's compatibility with conventional communication systems does not render it abstract. Nor does the fact that the improvement is not defined by reference to 'physical' components.").

Defendants' assertion that the '728 patent "nowhere instructs how to compress different types of data, or even how to examine data blocks" (MOT. at 15)

14

also fails. The specification makes clear that claims are aimed at solving problems associated with conventional lossless data compression techniques, including the "fundamental problem" of their "content sensitive behavior." ('728 patent at 2:29–3:19.) And the patent recites a specific solution for achieving that goal—i.e., by utilizing a combination of content-dependent and content-independent encoders to compress data blocks based on an analysis of the specific content or type of data being encoded, without relying solely on a descriptor such as a file extension. For example, when one or more digital-data parameters are identified in the content of a digital data block, the invention utilizes a content-dependent compression encoder. And if no such digital-data parameter is identified, the invention utilizes a content-independent encoder. The analysis of the digital data is not based solely a descriptor, thereby eliminating the problems associated with conventional content-dependent compression techniques. (*See id.* at 15:60–20:47 & claim 1.) Federal Circuit precedent confirms that this is sufficiently specific to pass muster under *Alice* step 1. *See, e.g.*, *Koninklijke*, 942 F.3d at 1148 (upholding patentability of comparable claim and rejecting the district court's findings that the claims were abstract because they "do not say how data is reordered, how to use reordered data," or "how the permutations are modified in time or modified based on the data"); *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1257–61 (Fed. Cir. 2017) (rejecting argument that the claims were abstract because they do not "describe how to implement the

'programmable operational characteristic'").[3] In fact, the Federal Circuit expressly described the claims in *SRI* as reciting "**general steps** for network monitoring with **minimal detail** present in the claim limitations themselves," and nonetheless held that they were not abstract. *Packet Intelligence*, 965 F.3d at 1309 (summarizing *SRI*).

Defendants' repeated assertions that the '203 patent is abstract because it "doesn't claim how data is analyzed, stored, compressed, or transmitted," and utilizes "generic" encoders that "can be implemented with any combination of 'hardware, software, [and] firmware' and employ 'encoding techniques well known in the art'" (MOT. at 18) fail for the same reasons discussed above. Like the '728 and '825 patents, the '203 patent is directed to solving problems associated with conventional digital data compression systems by utilizing a combination of content-independent and content-dependent compression techniques. (*See, e.g.*, '203 patent at Abstract & claim 1.) This is not abstract. And the invention's use of conventional components and its "compatibility with conventional [computer] systems does not render it abstract." *Uniloc*, 957 F.3d at 1308–09.

---

[3] *See also* Exhibit 1, which provides side-by-side comparisons of claim 1 of the '728 patent and the claims at issue in *Koninklijke*, *Visual Memory*, *Uniloc*, and *TecSec*. Realtime's claims are at least as specific, if not more specific, than the claims at issue in those and other cases where the Federal Circuit has upheld patent eligibility.

**3.    Defendants' arguments regarding the '908, '530, and '458 patents also improperly ignore the claimed advances and must be rejected.**

Defendants do not even attempt to articulate what they contend the '908 patent is directed to under *Alice* step 1. Instead, they generally assert that this Court previously found that the "'908 patent is 'directed to the combination of two abstract ideas,'" without actually specifying what those abstract ideas are. (MOT. at 22.) It is unclear whether Defendants agree with the Court's characterization of the claims, or whether they disagree but simply hope that the Court will reach the same conclusion. Either way, this generalized allegation fails to meet their burden to clearly and convincingly demonstrate that the claims are directed to ineligible subject matter.

But even ignoring this fatal deficiency, Defendants' reliance on the Court's characterization of the '908 patent is misplaced. The entire premise of parsing a patent into multiple purported abstract ideas, and then analyzing each purported abstract idea in isolation, is wrong. As discussed above, determining what the claims are "directed to" requires looking at the claims as a whole, considered in light of the specification, and "asking what the patent asserts to be the focus of the claimed advance over the prior art." *TecSec*, 978 F.3d at 1292; *Realtime*, 831 F. App'x at 496. Applying the proper analysis, it is clear that the '908 patent is directed to systems and methods for accelerated data storage and retrieval utilizing lossless data compression and decompression, which is not abstract. ('908 patent at Abstract,

17

1:15–18, 2:58–60, 4:42–44.) The '908 patent (and the '530 and '458 patents) addressed problems in the current art relating to digital data compression, including, *inter alia*, problems relating to bandwidth limitations. (*Id.* at 2:34–51.) Contrary to Defendants' suggestions, the claims do not merely recite a result—the patents solved these problems found in conventional digital data compression by providing specific technological solutions utilizing a plurality of encoders, and optionally a compression descriptor, for accelerated storage and retrieval of data blocks. (*See, e.g.*, *id.* at 3:25–33, 12:40–13:18, claim 1.)

Defendants argue that the statements in the patent specification discussing the problems in conventional digital data compression systems are "irrelevant to whether the '908 patent solved them, and particularly irrelevant to whether it solved them in a non-abstract manner." (MOT. at 22.) This is false. The Federal Circuit has held time and again that the "directed to" inquiry looks at exactly what Defendants say this Court should ignore: what the "patent asserts" to be the claimed advance. *TecSec*, 978 F.3d at 1292; *see also Enfish*, 822 F.3d at 1335–36 ("the first step in the *Alice* inquiry … asks whether the focus of the claims is on the specific **asserted** improvement in computer capabilities"). Indeed, in every single decision discussed above in Section II.B, the Federal Circuit relied on statements in the specification to conclude that the patents were not abstract. *See, e.g.*, *SRI*, 930 F.3d at 1303 (relying on specification's explanation that "the claimed invention is directed to solving …

weaknesses in conventional networks" to determine that the claims were not abstract).

Notably, Defendants cite *no authority* to support the erroneous proposition that the "directed to" inquiry requires a determination of whether the patents in fact solve those problems in a "non-abstract manner." *See CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1373 (Fed. Cir. 2020) ("[T]he court may consult the intrinsic evidence and conclude that the claims are directed to improving the functionality of a computer or network. The court need not consult the prior art to see if, in fact, the assertions of improvement in the patent's written description are true."). Realtime is not even sure how it would be possible to solve a specific technological problem in the realm of digital data compression in an "abstract manner" anyway.

Defendants' arguments regarding the '530 patent also fail. Defendants assert that the '530 patent is "directed to the abstract idea of compressing data with multiple distinct compression methods with the required result that storage is faster." (MOT. at 24.) This once again improperly oversimplifies the claims, ignores the patent's claimed advance, and ignores critical claim limitations. It is clear from the face of the patent that it is directed to computerized systems for compressing and storing digital data streams on memory devices by (1) compressing first and second data blocks of a data stream with different compression techniques and (2) storing the compressed data stream on a memory device; wherein (3) compressing and storing

19

the compressed data stream occurs faster than storing the uncompressed data stream on the memory device. (*See, e.g.*, '530 Patent at Abstract, claim 1.) This is not abstract. Nor do the claims merely recite a desired result, as Defendants contend. Rather, they recite specific solutions that utilize, *inter alia*, compressing data blocks with different compression techniques.

Defendants' assertion that the '458 patent does not "recite any technological improvement, but instead simply describe a form of data manipulation and analysis" (MOT. at 28) is patently false and is directly contradicted by the face of the patent. The '458 patent expressly states that the invention relates to particular systems and methods for "improving data storage and retrieval bandwidth utilizing lossless data compression and decompression." ('458 patent at 1:17–20.) The specification also identifies existing problems in digital data compression that the invention is intended to address, including that "high performance disk interface standards … offer only the promise of higher data transfer rates through intermediate data buffering in random access memory," "[f]aster disk access data rates are only achieved by the high cost solution of simultaneously accessing multiple disk drives with a technique known within the art as data striping," and "additional problems with bandwidth limitations similarly occur[ing] within the art by all other forms of sequential, pseudorandom, and random access mass storage devices." (*Id.* at 2:9–59.) The patent solves the foregoing problems with novel technological solutions in digital data

20

compression utilizing a plurality of different lossless dictionary compression encoders, and optionally a compression descriptor, for accelerated storage and retrieval of data blocks. (*Id.* at 2:63–3:62; 11:63–12:58.) Defendants simply ignore these clear statements to erroneously conclude that the claims merely recite a result and are abstract.

### 4. Defendants' arguments regarding the '751 patent also improperly ignore the patent's claimed advance and must be rejected.

Defendants assert that the '751 patent is "directed to the abstract idea of compressing data with a state machine, under conditions where compressing and storing the data is faster than storing the uncompressed data and where the compression method applied to the data is based on the content of the data." (Mot. at 32.) But as discussed above, even this oversimplified characterization of the claims demonstrates that they are not abstract. "Compressing data with a state machine … based on the content of the data" is inherently *not* abstract. *See, e.g.*, *TecSec*, 978 F.3d at 1295; *DDR*, 773 F.3d at 1259.

Defendants' oversimplification of the claims is wrong, in any event, as it improperly ignores the patent's claimed advance. As set forth in the complaints, "[t]he claims are not directed merely to compressing data or merely using compression to achieve faster data storage, but also to selecting an encoder to encode data based on more than just a computer descriptor, but instead the content of the

data." (D.I. 53 ¶ 50.) The patent specification discusses various problems in the existing art, including, for example, the high cost of implementing, disseminating, and operating trading systems due to the "high bandwidth required to transfer large quantities of data," and the "processing power required to store, transmit, route, and display the information," among other problems. ('751 patent at 2:42–56, 5:20–22.) And the '751 patent is aimed at solving these and other technological problems and limitations in the prior art compression systems by providing specific solutions— *i.e.*, by utilizing a state machine to compress data blocks based on an analysis of the specific content of the data being encoded. (*See, e.g.*, *id.* at 5:13–29, 6:13–40, 7:52–8:2, claim 1.) Accordingly, it is clear that the '751 claims "focus on specific asserted improvements in computer capabilities," and are not directed to an abstract idea. *TecSec*, 978 F.3d at 1293.

Defendants' assertion that the claimed "state machine" is "well-known in the art" (MOT. at 33) is unavailing. The specially-configured state machine is not conventional, as discussed further below, and even if it were, this could not transform the claims into an abstract idea. *See Packet Intelligence*, 965 F.3d at 1309.

Defendants' assertion that "a 'state machine' is merely "an abstract component in a method for information processing" (MOT. at 33) likewise fails. As an initial matter, characterizing a state machine as "abstract" makes no sense. More to the point, there is nothing in the record to support such a factual conclusion,

especially given this term has not yet been construed. And in any event, as discussed above, looking at individual claim limitations to determine whether they are abstract is the wrong analysis. When properly analyzing the patent's claimed advance and the "claim's character as a whole," it is clear that they are not abstract. *See Koninklijke*, 942 F.3d at 1149.

### 5. The cases cited by Defendants are inapposite.

Each of the cases cited by Defendants are distinguishable and do not support their argument that Realtime's patents are directed to a patent-ineligible abstract idea. Realtime's prior briefing discusses many of these cases at length, including *RecogniCorp*, *BSG*, *Content Extraction*, and *Electric Power*. (*Kaminario*, D.I. 33 at 16–20 & n.7.) Realtime refers to and incorporates that discussion herein.

Nor do the new cases cited by Defendants support their arguments. Unlike Realtime's claims, none of the claims at issue in those cases were directed to improving the functionality of a computer. For example, in *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359 (Fed. Cir. 2020), the claim recited a "data delivery system for providing automatic delivery of … specifically identified advertising data." *Id.* at 1363. The claim did not "improve the functionality of the computer itself," but rather, at best, "merely improve[d] the abstract concept of delivering targeted advertising using a computer only as a tool." *Id.*; *see also SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161 (Fed. Cir. 2018) (claims reciting "systems

and methods for performing certain statistical analyses of investment information"); *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1139 (Fed. Cir. 2016) (claims that "do not call for the involvement of a computer" and thus could not be characterized as an improvement in a computer); *WhitServe LLC v. Dropbox, Inc.*, No. CV 18-665-CFC, 2019 WL 3342949, at *4 (D. Del. July 25, 2019) (claims directed to the abstract idea of "backing up data records" and not to an improvement in computer functionality).[4]

Here, by contrast, Realtime's claims are clearly directed to non-abstract improvements to the functionality of a computer and provide particularized solutions to make digital data compression faster and more efficient. This case is analogous to the cases discussed above in Section II.B.[5]

### 6. Realtime's allegations that the claims cannot be carried out with pen and paper are relevant to the Court's prior decision.

Defendants' assertion that Realtime's "pen and pencil" allegations are irrelevant (MOT. at 8) is directly contradicted by the findings in this Court's prior

---

[4] Defendants' reliance on the dissenting opinion set forth in *MySpace, Inc. v. Graphon Corp.*, 672 F.3d 1250 (Fed. Cir. 2012), wherein the majority declined to decide eligibility under § 101, is of little if any value to the instant analysis, especially given that this case was decided years before *Alice*.

[5] The *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.* case mentioned in Judge Taranto's concurring opinion is also distinguishable, as the claims were directed to the abstract idea of "controlling access to resources," did not improve computer functionality, and could be "performed in the human mind." 955 F.3d 1317, 1327 (Fed. Cir. 2020).

order. The Court concluded that the claims are directed to an abstract idea based in part on its finding that "Nothing prevents [the claimed digital data compression methods] from being done on pen and paper." (D.I. 41 at 48.) Realtime's allegations directly address this finding and demonstrate that it is not true. (*See, e.g.*, D.I. 53 ¶¶ 19, 51, 80, 111.)

Indeed, the Federal Circuit recently rejected a similar argument in *SRI*. In that case, the defendant argued that the claims at issue, which related to monitoring suspicious activity on computer networks, were "so general that they encompass steps that people can 'go through in their minds.'" 930 F.3d at 1304. The Federal Circuit rejected this argument, holding that "[t]his is not the type of human activity that § 101 is meant to exclude"—"the human mind is not equipped to detect suspicious activity by using network monitors and analyzing network packets as recited by the claims." *Id.* Likewise, the human mind is not equipped to perform the digital data compression methods recited by Realtime's claims.

## B.    Defendants Also Cannot Show that the Claims Lack Inventive Concept Under *Alice* Step 2.

Because Defendants cannot meet their burden under step 1, the inquiry ends here and step 2 need not be addressed. But in any event, Defendants also cannot meet their burden under step 2.

25

1.  **The intrinsic record confirms that the claimed inventions involve unconventional technological solutions.**

As expressly set forth in the patents, the disclosed inventions provide improvements in digital data compression systems that addressed known problems in conventional prior art systems. The '728, '203, and '825 patents addressed problems relating to "data dependency," among other problems." ('728 patent at 2:7–3:55.) To solve these technological issues, the claims require specific, unconventional combinations of specially configured computer elements. For example, claim 1 of the '728 patent requires (a) "content dependent data compression encoders"; (b) a different "single data compression encoder"; and (c) and a processor configured to (i) "analyze data within a data block to identify one or more parameters or attributes of the data," where the "analyzing … excludes analyzing based solely on a descriptor"; (ii) "perform content dependent data compression … if the one or more parameters or attributes of the data are identified," and (iii) otherwise "perform data compression with the single data compression encoder." (*See also id.*, claims 24, 25; D.I. 53 ¶¶ 22–29.) The '203 and '825 patents likewise claim unconventional combinations of computer elements utilizing content dependent and content independent data compression. (*See, e.g.*, '203 patent, claims 1, 14, 21, 27; '825 patent, claims 1, 18, 23; D.I. 53 ¶¶ 83–88; D.I. 46 ¶¶ 81–86.)

The '908, '530, and '458 patents addressed problems in conventional digital data compression systems, including, *inter alia*, "problems with bandwidth

limitations … by all other forms of sequential, pseudorandom, and random access mass storage devices." ('908 patent at 2:20–54.) To solve these technological issues, the claims require specific, unconventional combinations of specially configured computer elements. For example, claim 1 of the '908 patent requires (a) "a memory device"; and (b) "a data accelerator" configured to utilize two different data compression techniques to provide a first and second compressed data block, which data blocks are stored on the memory device, and where the "compression and storage occurs faster than the first and second data blocks are able to be stored on the memory device in uncompressed form." (*See also id.*, claims 2–8, 13, 18–20, 22, 23, 25, 26, 28, 29; D.I. 53 ¶¶ 118–22.) The claimed data accelerator is unconventional, as it requires two different compression techniques and the structural capability of compressing and storing digital data faster than the digital data can be stored in uncompressed form. (*Id.*) Claim 1 of the '530 patent additionally requires that "a first data descriptor is stored on said memory device indicative of said first compression technique, and said first descriptor is utilized to decompress the portion of said compressed data stream associated with said first data block." (*See also* '530 patent, claims 2–5, 7–12, 16, 19, 22, 23, 25, 26; D.I. 52 ¶¶ 88–92.) And the '458 patent requires "compressing, if the parameter or attribute of the data within the data block or attribute of the data within the data block is not identified, the data block with at least one encoder associated with a non-identifiable

27

parameter or attribute of the data." (*See also* '458 patent, claims 1, 18, 23; D.I. 45 ¶¶ 82–87.)

Lastly, the '751 patent addressed specific problems in the prior art data compression systems, including, *inter alia*, "latency induced by the act of encryption, compression, decryption, and decompression." ('751 patent at 1:40–5:22.) The '751 patent solved these technological problems by providing an unconventional compression system allowing for a multiplication of bandwidth and a reduction in transmission latency. (*Id.* at 5:28–29.) For example, claim 25 of the '751 patent discloses a "system for compressing data" requiring a specific and unconventional combination of specially configured computer elements, including "a data server implemented on one or more processors and one or more memory systems and configured to" (a) "analyze content of a data block to identify a parameter, attribute, or value of the data block that excludes analysis based solely on reading a descriptor," (b) "select an encoder associated with the identified parameter, attribute, or value," (c) "compress data in the data block with the selected encoder to produce a compressed data block, wherein the compression utilizes a state machine," and (d) "store the compressed data block." Claim 25 further requires that "the time of the compressing the data block and the storing the compressed data block is less than the time of storing the data block in uncompressed form." (*See*

*also id.*, claims 1–3, 5, 10, 12, 16–23, 26, 27, 29, 33, 36–42, 44–47; D.I. 53 ¶¶ 53–58.)

In sum, the disclosed inventions do not merely recite well-understood, routine, conventional activities but, instead, are necessarily rooted in computer technology and provide specific, unconventional technological solutions that improve computer functionality and overcome problems specifically arising in the realm of compression of digital computer data. Thus, the patents amount to "significantly more" than simply claiming an abstract idea and are therefore patent-eligible.

### 2. Defendants' conclusory arguments regarding the '728, '203, and '825 patents are unsupported and contrary to law.

Defendants argue that the '728, '203, and '825 patents lack inventive concept because the claims: 1) utilize "known compression technology" and "generic" computer components (MOT. at 13, 19); 2) do not specify which compression technique to use (*id.* at 16, 20); and 3) merely describe a desired result (*id.* at 16, 21). These arguments are unsupported and contrary to longstanding Federal Circuit precedent.

*First*, the claimed components are not all generic. For example, the processor recited in claim 1 of the '728 patent must be specially configured to perform the recited, non-conventional functions, including analyzing the data to identify one or more parameters or attributes and performing compression with a plurality of different encoders based on that analysis. Moreover, the Federal Circuit has

repeatedly rejected the notion that the disclosure of conventional computing elements renders claims ineligible. "The inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art." *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). "[I]nventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Id.* Thus, properly viewing the claims as a whole, it is clear that the patents present unconventional solutions to improve computer functionality, as discussed in detail above.

That the patents utilize known encoding techniques/algorithms is also unavailing. Realtime does not assert that it invented a new type of encoding algorithm. Rather, the specification makes clear that the inventive aspect of the patents is their utilization of multiple encoders to compress data blocks based on an analysis of the specific content or type of the data being encoded without relying solely on a descriptor. *See id.* at 1349–50 (upholding eligibility of claims despite their recitation of "generic computer, network and Internet components, none of which is inventive by itself," as neither the patentee nor the specification described these elements as inventive).

*Second*, the fact that the claims do not specify which compression technique to use also does not render the claims ineligible. The inventive aspect of the claimed inventions is not what particular compression technique is used to encode the data.

Rather, the inventiveness lies in the patents' direct examination of the digital-data payload rather than examining just the descriptor. Defendants point to nothing to suggest that this was a previously known technique, and the patent specifications confirm that it was not previously known. Defendants simply ignore these statements.

*Third*, the patents do not merely claim a desired result. Nor do they "preempt all ways" of compressing data, or any of the various purported abstract ideas Defendants' argue they claims are directed to. *See Bascom*, 827 F.3d at 1350. Rather, they recite specific, discrete implementations of compressing data using an unconventional combination of content-dependent and content-independent compression techniques in order to solve known problems in conventional systems. Construing the patents and allegations in the complaints in favor of Realtime, as the Court must a motion to dismiss, it is clear that the claims are "more than a drafting effort designed to monopolize" any purported abstract idea. *Id.* Instead, the claims "improve an existing technological process," and are thus patent eligible. *Id.* at 1351.

### 3. Defendants' conclusory arguments regarding the '908, '530, and '458 patents are unsupported and contrary to law.

Defendants' *Alice* step 2 arguments regarding the '908, '530, and '458 patents largely amount to argument that Realtime has failed to demonstrate that the claims are not conventional. (*See, e.g.*, MOT. at 26 (arguing that Realtime "provides no factual content for why these are unconventional").) But it is not Realtime's burden

to prove that the claims are unconventional. The claims are entitled to a presumption of validity, and, thus, it is Defendants' burden to show that the "only plausible reading of the patent must be that there is clear and convincing evidence of ineligibility." *JSDQ Mesh Techs. LLC v. Fluidmesh Networks, LLC*, No. 16-CV-212-GMS, 2016 WL 4639140, at *1 (D. Del. Sept. 6, 2016). Defendants fall far short of this burden. Their conclusory assertions that the claims are conventional amount to little more than attorney argument, which cannot clearly and convincingly refute the intrinsic evidence supporting patentability. For example, Defendants provide no evidence or authority to support their bare assertions that "none" of the '908 patent's limitations are unconventional, that the '530 specification "merely discusses routine steps," or that "methods and structures [in the '458 specification] are neither claimed nor unconventional." (MOT. at 24, 25, 31.) The Court "must take the specification's statements about the purported invention to be true," and is "not free to accept [Defendants'] contrary attorney argument" that the claims are directed to conventional means. *MAZ Encryption Techs. LLC v. Blackberry Corp.*, No. CV 13-304-LPS, 2016 WL 5661981, at *5 (D. Del. Sept. 29, 2016).

Defendants' arguments that the claims lack inventive concept because they utilize some generic components and known compression techniques, do not specify "how an encoder should be chosen," and purportedly recite only "results-based limitations" (MOT. at 24, 26, 30) fail for the same reasons discussed above. The

patent specifications and Realtime's allegations make clear that the claimed components, such as the specially configured data accelerator, are not all generic. And again, "inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Bascom*, 827 F.3d at 1350. The specifications make clear that their inventiveness lies in their use of a plurality of different encoders, and optionally a compression descriptor, for accelerated storage and retrieval of data blocks—not in "how" the data is analyzed, compressed, or, stored, or how the encoder is selected, as Defendants suggest. Nor do the claims merely recite a desired result. These baseless assertions are directly contradicted by the claim language which recites highly specific steps and components to achieve those results and improve upon existing data compression methods. Defendants' contrary attorney argument cannot satisfy their burden to show that the claims are ineligible.

### 4. Defendants' conclusory argument regarding the '751 patent is unsupported and contrary to law.

Defendants' sole *Alice* step 2 argument for the '751 patent is that compression methods using state machines were "well-known in the art." (MOT. at 33.) Defendants also cite to the Court's prior order finding that the "claimed systems and methods can be performed on conventional computer hardware with well-known compression techniques." (D.I. 47 at 37.) This argument again fails for the reasons discussed above. Defendants must do "more than recogniz[e] that each claim

element, by itself, was known in the art." *Bascom*, 827 F.3d at 1350. Defendants have not met their burden. Their conclusory assertions do not and cannot overcome the statements in the specification and the claim language showing that the '751 patent provides unconventional technological solutions in digital data transmission, which provide, among other things, transmission and transparent multiplication of digital-data communication bandwidth, as well as a potential reduction of the latency associated with data transmission of conventional systems, and also by utilizing a state machine to compress data blocks based on an analysis of the specific content of the data being encoded. (*See, e.g.*, '751 patent at 5:13–29, 6:13–40.)

> ### 5.    The analysis under *Alice* step 2 involves questions of fact improper for resolution on a motion to dismiss.

As discussed in detail above, the faces of the patents themselves demonstrate that that they are inventive as they directed to unconventional technological solutions to address known problems in conventional data compression systems. Moreover, Realtime's amended complaints contain numerous detailed factual allegations demonstrating the inventiveness of each of the patents, as well as setting forth claim constructions which further underscore the eligibility of the patents. (*See, e.g.*, D.I. 53 ¶¶ 10–15, 20–32.) Contrary to Defendants' assertions, the statements in the patents filed by Altera and Western Digital are indeed relevant, as they confirm the then-existing technological problems with computer capacity and demonstrate that there was still a need for more efficient compression systems—which

Realtime's patents are directed to. (*Id.* ¶¶ 30–31.) In addition, multiple judges across different districts have considered the asserted patents and determined that they are inventive and directed to patent eligible subject matter. (*Id.* ¶¶ 12–15.)

At minimum, these allegations—which must be accepted as true and contradict Defendants' unsupported assertions that the claims are conventional—raise factual disputes precluding dismissal at the pleading stage. *See Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1126–28 (Fed. Cir. 2018).

### 6. Defendants have not clearly and convincingly shown that all 211 claims are ineligible.

Defendants fail to meet their burden to establish by clear and convincing evidence that all of the claims of the asserted patents (totaling 211 claims across seven patents and three distinct patent families) are ineligible. Defendants merely call out some of the limitations of a few dependent claims and provide conclusory attorney argument that they are not unconventional or provide only "meaningless distinctions." (*See, e.g.*, MOT. at 17, 21, 24, 27.) This is an improper analysis for the reasons discussed above. And regardless, Defendants' unsupported attorney argument cannot overcome the specific allegations in the complaint demonstrating that the claims recite unconventional means. *MAZ*, 2016 WL 5661981, at *5. Defendants have not shown that all 211 patent claims are ineligible under any standard, let alone the heightened standard on a motion to dismiss.

### C. As Set Forth in Realtime's Amended Complaints, Proper Construction of the Claims Confirms that the Claims Are Patent Eligible Under § 101.

Realtime's amended complaints offer fact-based claim constructions that confirm that the claimed solutions do not just cover any form of digital data compression techniques, but instead are more focused and cover a technical sub-species of digital data compression. (*See, e.g.*, D.I. 53 ¶¶ 10, 79, 117.)

Prior constructions in earlier cases further confirm that the claimed methods and systems are in fact limited to the compression of digital data. For example, a Texas court construed the term "compress"—a term used in all of the patents—as "represent data with fewer bits." (*Id.* ¶ 11.) This construction confirms that the claimed inventions are limited to the realm of digital-data compression, as a "bit" is a unit of digital data. Constructions of other claim terms, such as "data block" and "accelerator," also confirm that the patented inventions are unique to the compression of digital data. (*Id.*)

Indeed, at least one court has specifically ruled that if Realtime's "construction of the claims at issue prevails, the patents are more analogous to those in *DDR* because they provide technological solutions to problems arising specifically in the realm of computer technology," and, therefore, any "argument that the patents are directed to an abstract idea would fail." (*Kaminario*, D.I. 32-3 at 2.) The same conclusion should follow here. Under Realtime's proposed

constructions, which must be accepted, it is clear that the asserted patents are eligible under § 101. At minimum, they present fact issues that preclude dismissal.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.

July 13, 2021

OF COUNSEL:

Marc A. Fenster
Brian D. Ledahl
Reza Mirzaie
Paul A. Kroeger
C. Jay Chung
RUSS AUGUST & KABAT
12424 Wilshire Boulevard, 12th Floor
Los Angeles, CA 90025
(310) 826-7474
mfenster@raklaw.com
bledahl@raklaw.com
rmirzaie@raklaw.com
pkroeger@raklaw.com
jchung@raklaw.com

BAYARD, P.A.

*/s/ Stephen B. Brauerman*
Stephen B. Brauerman (No. 4952)
Ronald P. Golden III (No. 6254)
600 N. King Street, Suite 400
Wilmington, DE 19801
(302) 655-5000
sbrauerman@bayardlaw.com
rgolden@bayardlaw.com

*Attorneys for Plaintiff Realtime Data LLC*

37

## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMITATIONS

Pursuant to paragraph 19(c) of the Court's Form Scheduling Order for Patent Cases in Which Infringement Is Alleged, the undersigned certifies that this brief was prepared using Times New Roman, 14-point font, and contains 8,748 words, excluding the caption, tables, and signature block.

Dated: July 13, 2021               BAYARD, P.A.

                                      */s/ Stephen B. Brauerman*
                                      Stephen B. Brauerman (#4952)
                                      Ronald P. Golden III (#6254)
                                      600 N. King Street, Suite 400
                                      Wilmington, DE 19801
                                      (302) 655-5000
                                      sbrauerman@bayardlaw.com
                                      rgolden@bayardlaw.com